# CERTIFICATION OF STEVEN D'AGOSTINO

I, Steven D'Agostino, of full age, hereby certifies and says:

1) I am a pro se judgment creditor in this case, who was never notified of, nor even made aware of, the debtor's discharge until several years later.

2) I am seeking *nunc pro tunc* permission to allow my state court claims against the trustee to proceed in the NJ Superior Court, currently pending under docket number OCN-L-2326-19.

3) The debtor, Laurence A. Hecker, was a disgraced former attorney, having been suspended from the practice of law on three (3) separate occasions throughout his 45-year long career (i.e. from 1965 until 2011).

4) The first suspension was in 1988, the second suspension was in 2001, and the third suspension was in 2011. And after his third suspension, Hecker was never readmitted to the bar again, and he later died on May 17, 2017.

5) On May 7, 2010 Hecker had initially filed this bankruptcy petition, 10-24143-RTL, as a pro se debtor. And in doing so, Hecker had deliberately kept my name off of the notice matrix, because he knew that unlike his other creditors, I knew about his sordid history of hiding his assets, and that he had a girlfriend in Turkey, as well as other girlfriends in NJ and in other states.

6) On May 12, 2009, which was about a year before he filed this bankruptcy petition, I had obtained a jury verdict of $330,000 against Hecker for his legal malpractice in his handling of my 2002 employment matter, which involved my 13.5 year employment with the US Army as a computer scientist / electronics engineer.

7) However, the trustee in this bankruptcy case never even checked Hecker's paperwork for accuracy; let alone performed any investigation when Hecker claimed to have no assets, despite Hecker's admitting to earning over $160,000 per year at the time within his petition.

8) Because of this failure, Hecker was able to hide his assets with several "girlfriends", some of whom who were either out-of-state or out of the country. And it appears that all of those assets are now long since gone. However, if the trustee had performed his job properly, then I would have been able to recover at least some portion of those hidden assets. Further, it is likely that I also would have timely learned about the existence of an Errors & Omissions insurance policy, that should have paid 100% of my judgment against Hecker.

9) Since I do not wish to take any more of this Court's time than necessary, if the foregoing is sufficient to grant my request, then I ask you to please read no further and please allow me *nunc pro tunc* permission for my state court claims against the trustee to proceed in Superior Court. But if more details are needed, then please continue to read on, as I have explained more details in the following section.

19) Upon my investigation of this new information, I learned that the last 3 letters of the docket number for a bankruptcy petition stood for the judge's initials, and in turn that the bankruptcy judge for Hecker's petiton was the Honorable Raymond T. Lyons. So then sometime in mid July 2010, I found the phone number for judge Lyons; and when I called, I spoke to his courtroom deputy Diane Lipcsey (whom I have just learned is also now Your Honor's courtroom deputy).

20) During our July 2010 phone call, Diane Lipcsey had told me that Hecker's petition was about to be dismissed for one or more deficiencies. And then on July 23, 2010, she emailed a copy of the order of dismissal. *Attached hereto as exhibit B is a true copy of that email (sans the email's attachments).*

21) I had never heard anything further about Hecker's bankruptcy, until he mentioned it to me on Sep 17, 2013 when I went over to his house. (Mr. Peter Ragan Sr. was the debt collection attorney I found in the summer of 2013, who was about to execute a pre-foreclosure sale of his real estate prior to the mortgage company foreclosing on that property). During that Sep 17, 2013 conversation, Hecker then told me that he had re-filed his bankruptcy petition, but I didn't believe him until a few weeks later when Mr. Ragan called me, quite upset, after receiving an extortion letter from Hecker, threatening that unless Mr. Ragan paid him $1,000, he would seek fines and sanctions against Mr. Ragan for violating bankruptcy law.

22) When I told Mr. Ragan that I knew nothing about his bankruptcy discharge prior to Sep 17, 2013, I could tell that he did not believe me at first. But then about 5-10 minutes later Mr. Ragan called me back after he looked up the details of Hecker's bankruptcy case, and his tone of voice was night and day different. He told me that he had never seen anything like this before – that I was not on the notice matrix, nor was I listed on one of the two required places within the petition itself. He said it was unclear, but he thought that the discharge would be considered defective as to my judgment. However he was afraid to pursue collecting on the debt any further; unless and until Hecker tried to file a motion to correct the defects so as to include my judgment in his discharge, at which time he would be willing to file an opposition and cross motion on my behalf. (My understanding was that he did not want to initiate any action on a discharge that has been closed for 3 years, as it could be seen as harassing the debtor, but if instead Hecker initiated the action, then he would have no problems representing my interests via a cross motion). Mr. Ragan also informed me that on the NJ Judiciary website, it showed that my judgment was still active.

23) Then over 3 years later, after stumbling across Hecker's May 2017 obituary on the internet, I took a number of steps to finally collect on my judgment against Hecker. Of those steps, relevant to this case is the fact that I contacted Mr. Ragan again, who again was going to proceed with a pre-foreclosure sale of Hecker's former property, given that Hecker had no children, no immediate family, no heirs, etc. But then because of a snafu with the newly installed eCourts system in Ocean County, he was unable to complete that attempt before the bank foreclosed on the property on Oct 31, 2017.

24) Then afterwards, there were no assets remaining. However a couple months later I was able to get dozens of boxes of files (both on papers and on backup CDs) from Hecker's office before the foreclosing bank came in and threw it all into a dumpster.

25) Within those files, I found numerous documents that reveal either convincing or irrefutable proof that Hecker had been hiding his assets during the when he filed this bankruptcy petition and until well after the eventual discharge.

## Small sample of the evidence

26) I assume that this Court can easily lookup and refer to his amended schedules within his bankruptcy petition. In reviewing those schedules, Hecker admits to being paid $10,000 per month from the debt collection company as their in-house attorney, as well as earning an additional $2,000 per month from his own private practice of law. He also admitted to receiving $1,350 per month in social security payments. Thus at the time of his discharge, he admits to earning $160,200 per year. He claimed to have only $18 in cash, and only $413 in 3 separate bank accounts. He also purported that he had no stocks, bonds, mutual funds, etc. He did admit however to being a codebtor of APM Financial in regards to judgment creditor Steven Bess. He purported to have $8,102 in monthly expenses (despite the fact that he worked out of his house and only had 2 part-time employees). However, he failed to attach any detailed statement, which the schedule appears to require. He purported that despite grossing $13,350 per month, his net profit was only $303 per month. Please keep these facts in mind when considering the remaining paragraphs.

27) On March 10, 2011, just over a month after his bankruptcy discharge was granted, Hecker was then suspended from the bar for the third and final time. See *In re Hecker 205 N.J. 263 (2011)*. Thus, he could no longer earn either the $10,000 per month from the debt collection company, nor could he earn the alleged $2,000 per month from his own private law practice. Instead, now all he had coming in was the $1,350 per month from social security. Thus, even assuming arguendo that his purported $8,102 in monthly expenses was true and accurate, using his own numbers, he would be negative each month after his suspendsion (i.e. $12,000 in gross attorney income, minus the purported $8,102 in attorney expenses, would still yield a net gain of almost $4,000 per month in attorney income; but even with his stated net gain of $4,000 in attorney income, he purportedly was only be able to come out $303 ahead each month).

28) But even aside from the foregoing, and further assuming arguendo that Hecker could somehow magically save his entire $1,350 of income for each month after March 2011, the maximum amount that he could possibly as of September of 2011, just 6 months later, would only equal $8,100.

29) <u>Attached hereto as exhibit C</u> is a true copy of one of Hecker's ATM receipts, which although somewhat faded, appears to be dated September 16, 2011. This receipt shows that Hecker had a current balance of $10,757.78 as of that date, and an available balance of $7,257.78. This difference between the current balance and the available balance would infer that Hecker had recently made a $3,500 deposit which had not yet cleared.

30) <u>Attached hereto as exhibit D</u> is a true copy of a September 2011 printout from Hecker's Scottrade account, showing a balance of $5,871.15. The Scottrade account, was not listed in Hecker's bankruptcy petition, nor was any other investment listed.

31) So as of the end of Sep 2011, in just these 2 accounts alone, Hecker had assets of $16,628.93. There was no possible way that he could have even earned this much money after his discharge; let alone saved this much money from those post- bankruptcy earnings. But as shown below, there were yet still more undisclosed accounts.

32) <u>Attached hereto collectively as exhibit E</u> are true copies of October 2010 messages (or portions thereof) from Hecker's AOL email account, wherein Hecker is communicating with his Turkish bank, wanting to use his mutual funds to pay his credit card account. Notice that Hecker mentions having his credit card account with that bank for "all these years".

33) <u>Attached hereto as exhibit F</u> is a true copy of the first page a June 2009 bank statement from Hecker's TD Bank checking account, which shows his Turkish girlfriend, Selin Melek Aktan, as a joint account holder. (The top of the page with the logo was cut off, but the website address of www.tdbanknorth.com is clearly shown at the bottom). Notice how several of the withdraws from this bank account occurred in Istanbul, Turkey. Also notice that this TD bank checking account is not one of the 3 banks he had listed in his amended schedules.

34) <u>Attached hereto as exhibit G</u> is a true copy of a January 2012 wire transfer form, for Hecker to send $1,200 to Selin Melek Aktan in Turkey, with a blue post-it-note affixed over the signature portion (this was exactly the way I found it when I got the boxes of Hecker's files).

35) <u>Attached hereto as exhibit H</u> is a true copy of Hecker's February 22, 2011 internal memo, which shows that even just 3 weeks after his discharge, Hecker's mentions using his credit card from his Turkish bank, and he mentions using "Selin's address".

36) Larry Weil, and his debt collection company APM Financial, employed Hecker as their in-house attorney. Hecker, Weil, and APM were all codefendants in a lawsuit brought by Steven Bess. When Steven Bess was awarded nearly $700,000 in his lawsuit, Hecker, Weil, and APM became codebtors to judgment creditor Steven Bess.

37) <u>Attached hereto as exhibit I</u> is a true copy of Larry Weil's July 21, 2010 email to Hecker, where he complains about, amongst other things, Hecker bragging about his bankruptcy to the employees of APM

38) <u>Attached hereto as exhibit J</u> is a true copy of the August 2010 email chain between Larry Weil's and his bankruptcy attorney, where they discuss Hecker's conduct and refusal to cooperate, using an alter ego entity to escape the judgment (which Larry Weil himself referred to as "a shell") moving the funds to pay for the bankruptcy to a non-bankrupt entity, incurring the wrath of the bankruptcy courts, etc.

39) <u>Attached hereto as exhibit K</u> is a true copy of a bankruptcy document in docket 10-27239-RTL, for debtors APM Financial and Larry Weil, whom on June 4, 2010 had filed for bankruptcy and later attempted to prevent judgment creditor Steven Bess from being able to collect over $40,000 in liquid assets which they were hiding.

40) And please keep in mind that these attached exhibits constitute only the tip of the iceberg.

**I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.**

_Steven D'Agostino_       DATE: Mar 1, 2020